**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| ANTHONY TYRONE BOYD, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| vs. | )   **Case No. 11-CV-006-GKF-TLW** |
| | ) |
| ROBERT PATTON, Director,[1] | ) |
| | ) |
| Respondent. | ) |

## OPINION AND ORDER

Before the Court is the 28 U.S.C. § 2254 petition for writ of habeas corpus (Dkt. # 1), filed by Petitioner, Anthony Tyrone Boyd, a state prisoner appearing pro se. Petitioner originally filed his habeas petition in the United States District Court for the Western District of Oklahoma. The case was transferred to the Northern District on January 4, 2011. (Dkt. ## 6, 7). Respondent filed a response (Dkt. # 12) and provided the state court records (Dkt. ## 14, 16) necessary for the adjudication of Petitioner's claims. For the reasons discussed below, the petition for writ of habeas corpus shall be denied.

## *BACKGROUND*

On August 19, 2008, Dorothea Denise Wilson, a.k.a. Tina, went to Charlene Pipkins' house around 9:30 p.m. to purchase crack cocaine. (Dkt. # 14-6, Tr. Vol. III at 454). She and a friend, Kathy, drove around and smoked the crack. Id. at 520. Wilson returned to Charlene's house

---

[1]Since Petitioner is currently incarcerated at Lawton Correctional Facility, a private prison, the proper respondent in this case is Robert Patton, Director of the Oklahoma Department of Corrections. See Rule 2, Rules Governing Section 2254 Cases. For that reason, the Court Clerk shall be directed to substitute Robert Patton, Director, in place of Mike Addison, Warden, as party respondent in this matter.

approximately an hour later to purchase more "rock," returned to Kathy's car, and smoked.  Id. at 521.  Wilson returned to the house a third time to purchase more drugs, and stayed after offering to "take down [Charlene's] microbraids in her hair."  Id. at 454, 521.  While waiting to take down the braids, Wilson engaged in a conversation with Sheila Royal, a friend who was also at Charlene Pipkins' house.  Id. at 522.  While there, Petitioner walked into the house and went to the back room. Id. at 455, 522.  Petitioner came out of the back room and asked Wilson if she knew a Dorothea Wilson.  Id. at 455.  Wilson responded "that was my birth-given name."  Id.

Petitioner had a piece of paper in his hand, an affidavit for a search warrant, that listed Dorothea Wilson and other informants.  Id. at 455-56.  The paper was passed around to everyone in the house.  Id.  Everyone was reading the affidavit and getting different meanings from it, trying to determine if Wilson was or was not an informant or a snitch.  (Dkt. # 14-5, Tr. Vol. II at 262). Wilson denied she was an informant.  Id. at 262; Dkt. # 14-6, Tr. Vol. III at 256.  One individual, Brian Trimble, a.k.a. D.C., increasingly got upset with Wilson.  (Dkt. # 14-5, Tr. Vol. II at 263). Sheila Royal testified that Petitioner "never appeared to be angry about anything" and that she explained that it did not look like Wilson was a snitch.  (Dkt. # 14-6, Tr. Vol. III at 622).

Wilson testified that Petitioner told her that he had other papers at his house that would show she was an informant and that she should come with him to see those papers.  (Dkt. # 14-6, Tr. Vol. III at 458).  Wilson testified that "[e]verybody that was there" told her to go with Petitioner.  Id. Conversely, Charlene Pipkins, Sheila Royal, and Petitioner testified that Petitioner tried to calm things down and offered to take Wilson to his house.  (Dkt. # 14-5, Tr. Vol. II at 263; Dkt. # 14-6, Tr. Vol. III at 624; Dkt. # 14-7, Tr. Vol. IV at 654-55).  Petitioner asked Joyce Brewer for a ride.

(Dkt. # 1407, Tr. Vol. IV at 659). She was with an "individual [named] Kenneth." (Dkt. # 14-5, Tr. Vol. II at 264).

Wilson testified that as she was leaving and telling Charlene that she was not a snitch, Charlene told her, "just pray and put it in God's hands." (Dkt. # 14-6, Tr. Vol. III at 459). Wilson testified that when she was about to get in the truck to leave with Petitioner, "my guardian angel told me that I shouldn't go. I got real scared. And I changed my mind." Id. at 461. When she turned to go back to the house, "something sharp hit [her] in [her] back and [Petitioner] said, 'Bitch, you better come on.'" Id. Wilson did not see what touched her, but testified that it felt like a knife. Id. at 462. Charlene Pipkins and Petitioner all testified that Petitioner, Joyce, and Wilson were carrying Petitioner's grocery bags when they went to the truck. (Dkt. # 14-5, Tr. Vol. II at 265; Dkt. # 14-7, Tr. Vol. IV at 656-57).

Kenneth drove Petitioner and Wilson to Petitioner's house, located at 1712 N. Elgin Avenue in Tulsa, Oklahoma. (Dkt. # 14-6, Tr. Vol. III at 467-68). Once inside, Wilson testified that after Petitioner secured the doors and locked all four locks, "he dropped his pants and said, 'You know what I want.'" Id. at 469-473. Wilson made an attempt to leave. Petitioner grabbed her hair, threw her on the couch, and "yank[ed her] head and he forced [Wilson] to have oral sex with him." Id. at 474. After Petitioner finished, Wilson testified that she told Petitioner "they're waiting for me to come back over to Charlene's so I could take her hair down." Id. at 476. Eventually, Petitioner allowed Wilson to call Charlene,[2] and during the phone call, Wilson testified that Charlene asked if she was all right. Id. at 477. Wilson testified that she said no and then Charlene passed the phone

---

[2] Wilson testified that Petitioner made a phone call to Charlene before he let Wilson call Charlene. (Dkt. # 14-6, Tr. Vol. III at 478). Wilson's statement was somewhat unclear and unsupported by other testimony.

to Sheila.  Id.  Wilson testified that Petitioner got suspicious and mad.  Id. at 477-78.  She heard

Sheila say, "ask him whether or not there had been a murder yet?"  Id.

After that, Petitioner grabbed the phone from Wilson and threw it across the room.  Id. at

479.  She testified that Petitioner "started hitting and hitting and choking.  I heard my nose – I heard

the bone in my nose go crunch."  Id.  Petitioner tried to tie up Wilson with her shoestrings, but she

and Petitioner "ended up on the floor, and by then he was choking me and choking me.  He was

telling me to take off my pants."  Id.  She took off her pants, and Petitioner raped her.  Id. at 480.

She testified that she "closed her eyes and prayed for it to be over, and because of all the cuts and

stuff on [her] face, he was sweating, and it was dripping, and it was burning my face."  Id.

Petitioner finished, got up, and they went to the bathroom.  Id. at 481.  Petitioner told her to

wash her face.  Id.  They returned to the living room, where Wilson testified that Petitioner accused

her of taking the phone.  Id. at 485.  He raped her again on the couch.  Id. at 483, 485.  Wilson

testified that Petitioner started watching "a porn flick," had found Wilson's crack pipe in her purse

with "residue of crack cocaine on it so he hit that, and from there he wanted to do sexual positions

that was on the tape."  Id. at 487.  Wilson said Petitioner then tried "a certain position . . . [and] it

almost hit me anally, but it didn't, and I said, 'Oh, no,' and he moved it."  Id. at 489.  Wilson

testified that Petitioner again forced her to have sex for a third time.  Id. at 490.  She said she did not

have the energy to fight back because "fighting back . . . took everything out of me."  Id. at 491.

Petitioner forced Wilson to sleep with him on the couch in his living room, and placed his

arm over her "so if [she] moved, he could feel [her]."  Id. at 493.  They fell asleep, and when Wilson

woke up, she saw daylight.  Id. at 496.  She slowly got off of the couch and went to the bathroom.

Id.  When she returned, Petitioner was still asleep.  Id.  Wilson got dressed, slowly unlocked the

doors, and on the last lock, Petitioner woke up. Id. at 497. Wilson ran away, screaming, and "ran to the first door I seen [sic] open . . . and [asked them to] please call 911." Id. at 497.

Petitioner testified he and Wilson had a pre-existing sexual relationship where he would give her crack in exchange for oral sex and cleaning his house. (Dkt. # 14-7, Tr. Vol. IV at 645-46). He testified that they both smoked crack that night and that the oral sex was consensual. Id. at 668-69. Petitioner testified that after Wilson called Charlene, her attitude changed, and he hit her. Id. at 673. He testified that he does not "really like doing the vagina thing [and t]he only reason [he had vaginal sex] was to please her. To make up for hitting her." Id. at 677.

Tulsa Police Officer Keith Eddings, responding officer to the 911 call, testified that Wilson was visibly upset, crying and physically injured. (Dkt. # 14-5, Tr. Vol. II at 277). He testified that Wilson told him a brief version of the events of the previous night. Id. Wilson was taken to Hillcrest Medical Center and examined by Dr. Jeff Johnson, an emergency room physician. Id. at 324. He testified that Wilson had a broken nose, bruised face, and was crying and visibly upset. Id. at 324-26. Kristy Elias, a Sexual Assault Nurse Examiner (SANE), testified that Wilson's face was bloodied and she was sobbing. Id. at 335. Ms. Elias performed a rape examination and observed a vaginal tear, bruising on her wrists, and collected swabs from her mouth and vaginal area. Id. at 342-47. She also wrote out the narrative of the assault as conveyed to her by Wilson. Id. at 340.

Tulsa Police Officer Rufus Newsome testified that when Petitioner came out of his house, Petitioner told the police that, in Officer Newsome's own words,[3] "he had not raped her, but he had

---

[3]The prosecutor elicited further testimony from Officer Newsome as to Petitioner's actual words:

had sex with her and she was his crackhead." (Dkt. # 14-5, Tr. Vol. II at 305). Petitioner was interviewed by Tulsa Police Detective Rodney Russo. Detective Russo was unavailable for trial, but gave testimony before the trial court prior to trial. See Dkt. # 14-2. That testimony was then read into the trial record. (Dkt. # 14-5, Tr. Vol. II at 412-447). Russo testified that Petitioner told him "that he wanted to beat her a**, and then make her have sex with him." Id. at 421.

Based on these facts, Petitioner was charged in Tulsa County District Court, Case No. CF-2008-4265, with Assault with a Dangerous Weapon (Count I), Kidnapping (Count II), Rape - First Degree (Count III), Rape - First Degree (Count IV), and Forcible Sodomy (Count V). (Dkt. # 14-14, O.R. at 1-2). On May 19, 2009, a jury found Petitioner guilty of Assault and Battery (Count I) and guilty of Counts II - V, as charged, each After Former Conviction of Two or More Felonies. Id. at 6. The jury recommended a 90-day term of imprisonment and a fine of $1,000.00 for Count I, a twenty (20) year term of imprisonment and a fine of $2,500.00 for Count II, a term of life imprisonment and a fine of $6,000.00 for both Counts III and IV, and a twenty-five (25) year term of imprisonment and a fine of $3,000.00 for Count V. Id. On May 26, 2009, the trial judge sentenced Petitioner in accordance with the jury's recommendation, with the sentences for Counts

---

Q:      And when he came out, did he tell you that he didn't rape her but he did f*** her?
A:      He did say that, sir.
Q:      All right.  And did he make another statement about the supposed victim?
A:      Yes, sir, he did.
Q:      And was that, "F*** that bitch.  She's a crack whore."?
A:      He did, sir.
Q:      And was that verbatim what the defendant said, not what you said?
A:      Yes, sir, that's what the defendant said.

(Dkt. # 14-5, Tr. Vol. II at 305).

III and IV to run concurrent each other, and consecutive to the sentences for Counts I, II, and V. Id. at 7.  At trial, Petitioner was represented by attorney Kyle H. Killam.

Petitioner, represented by attorney Virginia Sanders, perfected an appeal to the Oklahoma Court of Criminal Appeals (OCCA).  He raised seven (7) propositions of error:

Proposition I:    The presentation of improperly admitted, irrelevant and highly prejudicial evidence violated Anthony Boyd's rights to due process, an impartial jury panel, and a fair trial.

Proposition II:    The trial court abused its discretion in denying appellant's motion for a continuance which caused Appellant to be denied due process of law and to be prejudiced by unprepared and ineffective assistance of counsel.

Proposition III:    Mr. Boyd was denied effective assistance of counsel.

Proposition IV:    Prosecutorial misconduct deprived Anthony Boyd of a fair trial, created fundamental error and resulted in an excessive sentence.

Proposition V:    The trial court improperly took on the role of advocate and not that of an impartial tribunal when it erroneously excluded Kenneth Whited's testimony at the jury trial.

Proposition VI:    Improperly admitted, highly prejudicial evidence and prosecutorial misconduct resulted in an excessive sentence for Mr. Boyd in this case.

Proposition VII:    The cumulative effect of all these errors deprived Appellant of a fair trial and warrant relief for Anthony Boyd.

(Dkt. # 12-1).  In an unpublished summary opinion filed June 14, 2010, in Case No. F-2009-551, the OCCA affirmed Petitioner's Judgement and Sentence.  (Dkt. # 12-3).

On November 18, 2010, Petitioner filed his pro se federal petition for writ of habeas corpus. (Dkt. # 1).  Petitioner raises the same seven (7) grounds of error raised on direct appeal. See Dkt. # 1.  Respondent contends that the OCCA's decisions on Grounds III, IV and VII, are not contrary

to or an unreasonable application of federal law, and that Grounds I, II, V, and VI are matters of state law not cognizable on federal habeas review.  (Dkt. # 12).

*ANALYSIS*

**A.      Exhaustion/Evidentiary hearing**

As an initial matter, the Court must determine whether Petitioner meets the exhaustion requirement of 28 U.S.C. § 2254(b).  See Rose v. Lundy, 455 U.S. 509, 510 (1982).  Petitioner presented his claims to the OCCA on direct appeal.  Therefore, he has exhausted his state court remedies.

In addition, the Court finds that an evidentiary hearing is not warranted as Petitioner has not met his burden of proving entitlement to an evidentiary hearing.  See Williams v. Taylor, 529 U.S. 420 (2000); Miller v. Champion, 161 F.3d 1249 (10th Cir. 1998).

**B.      Claims adjudicated by the OCCA**

The Antiterrorism and Effective Death Penalty Act (AEDPA) provides the standard to be applied by federal courts reviewing constitutional claims brought by prisoners challenging state convictions.  Under the AEDPA, when a state court has adjudicated a claim, a petitioner may obtain federal habeas relief only if the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  See 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 386 (2000); Neill v. Gibson, 278 F.3d 1044, 1050-51 (10th Cir. 2001).  When a state court applies the correct federal law to deny relief, a federal habeas court may consider only whether the state court applied the federal law in an objectively reasonable manner.  See Bell v. Cone, 535 U.S.

685, 699 (2002); Hooper v. Mullin, 314 F.3d 1162, 1169 (10th Cir. 2002). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Harrington v. Richter, 131 S. Ct. 770, 784-85 (2011).

Generally, a federal habeas court has no authority to review a state court's interpretation or application of its own state laws. Estelle v. McGuire, 502 U.S. 62, 67–68 (1991) (emphasizing that it is not the province of a federal habeas court to reexamine state court determinations on state law questions). When conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States. Id. at 68 (citing 28 U.S.C. § 2241; Rose v. Hodges, 423 U.S. 19, 21 (1975)).

### 1.      Prosecutorial misconduct and excessive sentence (Ground IV)

In Ground IV, Petitioner claims that "prosecutorial misconduct deprived [Petitioner] of a fair trial, created fundamental error and resulted in an excessive sentence." (Dkt. # 1 at 21). Petitioner claims "[t]he prosecutor committed misconduct in several different areas of this trial," and raises several allegations of prosecutorial misconduct in his habeas petition. Id. First, Petitioner claims that the prosecutor asked improper questions during voir dire. Id. Second, Petitioner alleges that prosecutor improperly "bolstered the complaining witness" in opening argument and during direct examination of two witnesses. Id. Third, Petitioner claims the "prosecutor improperly and intentionally introduced States's Exhibit 51, containing prior allegations of kidnaping and rape." Id. Lastly, Petitioner alleges several instances of misconduct during closing arguments. These are: improper attacks on defense counsel during closing arguments, id. at 22; "[i]mproper attempts to invoke Societal alarm and to create sympathy for complaining witness," id. at 23; and, an

"[i]mproper argument to the jury that they are to 'do justice' and to sentence [Petitioner] to life imprisonment," id.

On appeal, the OCCA found that "[m]ost of the comments at issue were proper and given the State's evidence against Appellant, any inappropriate comments did not deprive Appellant of a fair trial or affect the jury's finding of guilt or assessment of punishment." (Dkt. # 12-3 at 3). The OCCA concluded that prosecutorial misconduct did not deprive Petitioner of his right to a fair trial. Id.   Respondent argues that the OCCA's decision was not "contrary to or an unreasonable application of federal law." (Dkt. # 12 at 26).

Habeas corpus relief is available for prosecutorial misconduct only when the prosecution's conduct is so egregious in the context of the entire trial that it renders the trial fundamentally unfair. Donnelly v. DeChristoforo, 416 U.S. 637, 642-48 (1974); Cummings v. Evans, 161 F.3d 610, 618 (10th Cir. 1998). In other words, "absent the infringement of a specific constitutional right, prosecutorial misconduct can result in constitutional error if it 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" DeRosa v. Workman, 679 F.3d 1196, 1222 (10th Cir. 2012) (quoting Donnelly, 416 U.S. at 643).  "[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned." Darden v. Wainwright, 477 U.S. 168, 181 (1986) (internal quotation marks omitted). The ultimate question is whether the jury was able to fairly judge the evidence in light of the prosecutors' conduct. Bland v. Sirmons, 459 F.3d 999, 1024 (10th Cir. 2006).  To determine whether a trial is rendered fundamentally unfair, the Court examines the entire proceeding, "including the strength of the evidence against the petitioner, both as to guilt at that stage of the trial and as to moral culpability at the sentencing phase," as well as "[a]ny cautionary steps - such as instructions to the jury - offered by the court to counteract improper

10

remarks." <u>Le v. Mullin</u>, 311 F.3d 1002, 1013 (10th Cir. 2002). "To view the prosecutor's statements in context, we look first at the strength of the evidence against the defendant and decide whether the prosecutor's statements plausibly could have tipped the scales in favor of the prosecution." <u>Fero v. Kerby</u>, 39 F.3d 1462, 1474 (10th Cir. 1994) (quotations omitted); <u>see</u> <u>also</u> <u>Smallwood v. Gibson</u>, 191 F.3d 1257, 1275-76 (10th Cir. 1999).

In this case, the evidence against Petitioner was strong. It included, (1) testimony from the responding police officers and emergency medical responders (EMSA) as to the physical appearance, demeanor, and emotional state of Wilson; (2) testimony of the emergency room physician and the nurse who conducted the Sexual Assault Nurse Exam (SANE) of Wilson; (3) testimony of Wilson; (4) testimony of Petitioner; and (5) testimony from various individuals who observed Petitioner and Wilson at Charlene Pipkins' house.

### a.    Voir dire

Petitioner's first sub-claim of prosecutorial misconduct centers around statements the prosecutor made during voir dire. Specifically, Petitioner contends the prosecutor asked multiple prospective jurors if they had ever raped anyone, and asked a prospective juror, "[d]o you think you know rape when you see it?" (Dkt. # 1 at 21; Dkt. # 14-4, Tr. Vol. I at 153). Petitioner states that two of the venire persons asked these questions served on the jury. (Dkt. # 1 at 21). Petitioner argues that "relief is necessary" because "[i]t was improper and prejudicial for the State to ask these questions of the potential jury panel." <u>Id.</u> Respondent argues that read in context, "it is plain that the prosecutor was trying to discover any of the jurors' bias against a woman in a situation where she had previously engaged in sexual behavior with a man, but subsequently accused him of raping her when she refused to have sex with him." (Dkt. # 12 at 24). Respondent argues further that the

11

prosecutor "clearly was trying to ascertain the jurors' understanding of the legal definition of rape as he had provided to them and as they would be instructed upon if they served on the jury." Id. at 25.   Therefore, Respondent argues the questioning by the prosecutor was permissible.   Id.

Voir dire functions to "enabl[e] the court to select an impartial jury and assist[] counsel in exercising peremptory challenges." Mu'Min v. Virginia, 500 U.S. 415, 431 (1991).   "The Constitution permits state trial courts great latitude in conducting voir dire, including inquiry into subjects which might tend to show juror bias." Id. at 423; see also Wilson v. Sirmons, 536 F.3d 1064, 1097 (10th Cir. 2008).   Because Petitioner does not argue that the prosecutor's statements during voir dire violated a specific constitutional right, this Court analyzes this claim under the fundamental fairness standard of Donnelly.

After a careful review of the totality of the circumstances of the trial, the Court does not find the statements of the prosecutor so prejudiced the jury against Petitioner as to deny him the fundamental fairness to which he is entitled under the Constitution. See Brecheen v. Reynolds, 41 F.3d 1343, 1356 (10th Cir. 1994).   First, this case involved multiple counts of sexual assault, including two counts of first degree rape.   It is reasonable to expect the prosecutor and/or defense counsel to examine potential jurors' perceptions of the crime of rape during the voir dire proceedings.   Second, the statements about which Petitioner complains were made after the prosecutor completed a lengthy voir dire on the topic of rape. See Dkt. # 14-4, Tr. Vol. I at 129-145. During this part of the voir dire, the prosecutor narrowly focused his questions to probing the elements as outlined in the jury instruction.[4]

---

[4]During voir dire, the prosecutor asked several blunt questions on the topic of rape.   The prosecutor discussed the elements of rape as defined by the jury instructions, (Dkt. # 14-4, Tr. Vol. I at 140), asked a prospective female juror, "[i]s it rape if you say no, and another person forces –

The statements Petitioner complains of occurred after the prosecutor had turned his focus to the elements of kidnapping and assault with a dangerous weapon. <u>See</u> Dkt. # 14-4, Tr. Vol. I at 146-52. At this point, the prosecutor asked three jurors individually, "have you ever raped anyone?" <u>Id.</u> at 153. He asked one of the three a follow-up question, "[d]o you think you know rape when you see it?" <u>Id.</u> The prosecutor then moved on to discussing snitches and whether the jurors had "ever been snitched out [or r]atted out?" <u>Id.</u> at 154. Petitioner fails to show how these questions so infected his trial with unfairness so as to deny him due process or prevented those individuals who did serve on the jury from fairly judging the evidence in light of the prosecutor's conduct. Petitioner offered no objection at trial to any of the prosecutor's voir dire statements or questions regarding rape. Moreover, those individuals who served on the jury took an oath to determine Petitioner's guilt or innocence based on the evidence and testimony presented at trial. <u>See, e.g.</u>, Dkt. # 14-4, Tr. Vol. I at 87-88; Dkt. # 14-5, Tr. Vol. II at 222-23. Absent a showing otherwise, the Court assumes the jury abided by its oath. <u>See</u> <u>United States v. Beckman</u>, 222 F.3d 512, 519 (8th Cir. 2000). Petitioner has failed to show that questions posed in voir dire had a prejudicial impact on the jurors. Therefore, Petitioner has failed to show the OCCA's decision was contrary to or an unreasonable application of federal law as interpreted by the Supreme Court. Habeas relief on this sub-claim is denied.

**b.      Bolstering victim's testimony**

In Petitioner's next sub-claim, he contends the prosecutor "improperly sought to have Officer Eddings and Ms. Elias, the nurse examiner, testify to the truthfulness and credibility of the

---

in your case, forces their penis into your vagina," <u>id.</u> at 131, asked married prospective male jurors if it was "possible to rape your wife," <u>id.</u> at 134-136, and presented hypothetical scenarios and asked, "is that rape?" <u>id.</u> at 135, 136.

compliant [sic] Wilson." (Dkt. # 1 at 21). Petitioner also claims that the prosecutor bolstered the credibility of Wilson "in his opening statements by improperly arguing about witness credibility[, rather] than outlining the evidence." Id. Respondent argues "the State was entitled to present testimony which supported an inference that the victim was credible" because Petitioner's counsel said "the victim was lying, that [the sex] was consensual" during his opening statement and because the State's first witness, Charlene Pipkins, "impugn[ed]" the victim's credibility when she testified that the victim and Petitioner were "kick[ing] it," or having sex and partying together. (Dkt. # 12 at 7). Respondent argues that the testimony from Officer Eddings and Nurse Elias was based on their training and experience in determining whether individuals were telling the truth. Id. at 8-9. Respondent also claims that because the jury had to determine the credibility of the victim "against a backdrop of drug use and drug culture," the testimony was "helpful in assisting the jury to determine the victim's credibility." Id. at 8. Finally, Respondent argues that the prosecutor was "entitled to remind jurors of their duty to make the[] determinations [of credibility of witnesses] in opening statements and to listen closely to the evidence in order to make these decisions." Id. at 28.

Argument or evidence is permissible vouching unless "'the jury could reasonably believe that the prosecutor is indicating a personal belief in the witness' credibility, either through explicit personal assurances of the witness' veracity or by implicitly indicating that information not presented to the jury supports the witness' testimony.'" Thornburg v. Mullin, 422 F.3d 1113, 1132 (10th Cir. 2005) (quoting United States v. Magallanez, 408 F.3d 672, 680 (10th Cir.2005) (internal quotation marks omitted)); see also United States v. Bowie, 892 F.2d 1494 (10th Cir. 1990). A prosecutor's vouching for the credibility of witnesses can "jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury[,] and the prosecutor's opinion carries

with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." United States v. Young, 470 U.S. 1, 18-19 (1985) (citing Berger v. United States, 295 U.S. 78, 88-89 (1935)).

As to Petitioner's claim that the prosecutor improperly bolstered the credibility of Wilson during opening argument, the Court finds that this claim falls short. The purpose of an opening statement "is to state what evidence will be presented, to make it easier for the jurors to understand what is to follow, and to relate parts of the evidence and testimony to the whole." United States v. Dinitz, 424 U.S. 600, 612 (1976) (Burger, C.J. concurring). Here, Petitioner complains that the prosecutor "bolstered" the credibility of Wilson when he "argued to the jury to consider the individual's biases . . . [and] to judge credibility." (Dkt. # 1 at 21). When placed into context, the opening statements[5] related the anticipated testimony to the whole of the case. In other words, the prosecutor was telling the jury to evaluate the testimony of each witness in light of all of the evidence presented, combined with the relationship among the individuals, if any. The Court finds this was not bolstering the credibility of Wilson's testimony.

As to Petitioner's claim that the prosecutor improperly solicited testimony from State's witnesses to bolster Wilson's credibility, the Court finds this was also not improper. Here, defense counsel attacked the credibility of Wilson during his opening statement. "It is widely recognized

---

[5]The prosecutor stated,

And, ladies and gentlemen, as you hear testimony about this, and as you receive information about this, as we spoke about in voir dire, please consider, should you hear from individuals what their biases are, who is their friend, remembering that nobody likes a snitch, and please judge the credibility. In fact, the State anticipates calling one of these individuals whose bias, friendship, could very well not be to Dorothea Wilson.

(Dkt. # 14-5, Tr. Vol. II at 233).

that a party who raises a subject in an opening statement 'opens the door' to admission of evidence on that same subject by the opposing party." United States v. Chavez, 229 F.3d 946, 952 (10th Cir. 2000); see also United States v. Magallanez, 408 F.3d 672, 679 (10th Cir. 2005); United States v. Croft, 124 F.3d 1109, 1120 (9th Cir. 1997) ("It is permissible . . . to bolster the testimony of a witness whose credibility has been attacked in an opening statement"); United States v. Moore, 98 F.3d 347 (8th Cir. 1996) (defense put intent at issue and opens the door when, during opening statement, counsel argued that defendant was "simply 'the wrong man at the wrong time at the wrong place'"); United States v. Smith, 778 F.2d 925, 928 (2d Cir. 1985) (a prosecutor can elicit testimony on the "truth-telling portions of a cooperation agreement" if defense counsel attacks witnesses' credibility in opening argument); United States v. Knowles, 66 F.3d 1146, 1161 (11th Cir. 1995) ("When the defense attacks the witness's credibility in its opening statement, however, then the prosecutor is permitted to elicit testimony about the truth telling requirement on direct examination."). Additionally, the Oklahoma evidence code does not define "bolstering," and thus Oklahoma courts tend to restrict use of the term to rehabilitation of a witness before their credibility is attacked. See Nickell v. State, 885 P.2d 670, 677 (Okla. Crim. App. 1994) (Lumpkin, J., concurring).

Defense counsel attacked or questioned the victim's credibility at least three times during his opening argument. First, defense counsel used the analogy of a brick wall and that Wilson served as the "very foundation" for that hypothetical wall. Counsel told the jury, "no matter how strong that wall is, if the foundation is weak, if there's a weakness in the foundation, then the strongest wall will fall." (Dkt. # 14-5, Tr. Vol. II at 240). Next, defense counsel told the jury he would call one or two witnesses to "refute Ms. Wilson's testimony. At least a portion of it. And

allow that for you to judge whether the rest of the story that she tells is truthful." Id. at 241. Finally, defense counsel told the jury,

> [t]here's an expression: Those that tell a lie long enough, loud enough, and often enough, will have people believing. That's paraphrasing it. The person that said that quote was Adolph Hitler. But it's true. You convince and tell a lie often enough, long enough, loud enough, you tell an EMT, a police officer – . . . What would motivate her to lie like that?

Id. at 241-42. The Court concludes that these statements were sufficient attacks on the credibility of Wilson to open the door for the prosecutor to address the veracity of the victim's story during direct examination.

The first witness called by the State was Tulsa Police Officer Keith Eddings, one of the responding officers to the 911 call. Presumably in response to defense counsel's opening statements, the prosecutor asked Officer Eddings, "did she appear to you to be faking or lying to you regarding her injuries?" Id. at 278. Officer Eddings replied, "[t]hat would have been impossible for that because of the physical damage done to her face that I could observe." Id. The prosecutor followed up by asking, "was she trying to fool you about her injuries or what had happened to her . . . ?" Id. Officer Eddings replied, "[w]ith the details involved with how she was familiar with that address, and the statements that she made, I would say she was absolutely being truthful." Id. Petitioner's counsel did not object.

Petitioner also complains that the prosecutor continued bolstering Wilson's story on redirect examination of Officer Eddings.[6]  What Petitioner fails to acknowledge, however, is that defense

---

[6]On redirect, the following exchange occurred between Officer Eddings and the prosecutor:

Q:    Was Dorothea Wilson believable to you, based on your 17 1/2 years, regarding her detailed description of the rape she had just endured?

counsel again questioned the victim's credibility during cross examination.  Near the end of cross, defense counsel asked Officer Eddings, "have you ever responded to a scene and had a witness that you later found out you were lied to?"  Id. at 294.  The trial court overruled the State's objection, and Officer Eddings answered, "[y]es."  Id.  Yet again, defense counsel opened the door, allowing the state to elicit testimony regarding the truthfulness of Wilson's story.

Turning to the testimony of Kristy Elias, Petitioner complains of bolstering during redirect examination.  See Dkt. # 1 at 8.  However, Petitioner again fails to acknowledge that defense counsel questioned the credibility of Wilson's story during his cross-examination of Elias.  Defense counsel asked questions, such as, "it's possible that there could have been consensual sex and she could have receive that same [vaginal] tear," and "digital manipulation of the vagina can also cause that as well."  (Dkt. # 14-5, Tr. Vol. II at 356-57).  At the close of cross, defense counsel asked Ms. Elias,

---

[trial court overrules defense objection, stating it is within the framework of cross]

A:      The details that she provided led me to believe that she was truthful, yes.
. . .

Q:      In 17 1/2 years, you've had a lot of folks lie to you.  Right?
A:      Correct.
Q:      Is it rare for defendants, as well as other individuals, to lie to the police?
A:      It's very common.
Q:      Okay.  During your experience, education, and training, do you find that things help you in determining when an individual is telling the truth?
A:      Yes.
Q:      And did you apply those regarding your interviewing with Dorothea Denise Wilson while she was there bleeding with you?
A:      We utilize those with everybody you talk to.  So it would be a yes.
Q:      And at any point while talking with Dorothea Denise Wilson, did you think she was lying to you?
A:      No.

(Dkt. # 14-5, Tr. Vol. II at 295, 297).

"[s]o it is possible that she may not have been raped." Id. at 358.  Ms. Elias responded, "[i]t's possible." Id.  The door was opened for the prosecutor to ask on redirect, "[i]t didn't appear to you in any way that Dorothea was making up her injuries?" Id. at 360.  The Court finds this question served to rehabilitate the witness after an attack on Wilson's credibility.

After a review of the record, the Court finds that the testimony elicited from Officer Eddings and Ms. Elias did not render Petitioner's trial fundamentally unfair.  The questions elicited answers based upon training, experience, and personal observations of Wilson the morning of August 20, 2008.  Petitioner fails to show that the prosecutor's actions were improper in light of defense counsel's opening the door by questioning and attacking the credibility of Wilson during opening argument and on cross-examination.  Petitioner is not entitled to habeas relief on his sub-claims of improper bolstering.

### c.      Improper introduction of State's Exhibits 2A and 51

In the third sub-claim of prosecutorial misconduct, Petitioner contends the prosecutor "improperly and intentionally introduced State's exhibit [51], containing prior allegations of kidnaping and rape that were never found to be true as charged against [Petitioner]." (Dkt. # 1 at 21).  Additionally, Petitioner claims that his videotaped interview in State's Exhibit 2A "introduced irrelevant and improper evidence of other crimes, the close relationship between officer and suspect, numerous arrests, the use of guns, etc. [sic]" Id. at 22.  Petitioner then claims that the Prosecutor "emphasized this improper evidence in his closing argument to the jury[,]" depriving Petitioner of a fair trial.  Id.  The OCCA found that the trial court did not abuse its discretion in admitting the evidence.  (Dkt. # 12-3 at 2).

"A prosecutor should not knowingly and for the purpose of bringing inadmissible matter to the attention of the judge or jury offer inadmissible evidence, ask legally objectionable questions, or make other impermissible comments or arguments in the presence of the judge or jury." AMERICAN BAR ASSOCIATION STANDARDS FOR CRIMINAL JUSTICE: PROSECUTION AND DEFENSE FUNCTION § 3-5.6 (Presentation of Evidence) (1992). The Court concludes in Part B(2), below, that, although evidentiary rulings are matters of state law, the trial court's admission of State's Exhibits 2A and 51 did not deprive Petitioner of due process or render his trial fundamentally unfair. Having arrived at this conclusion, the Court cannot find that the prosecutor violated professional standards or deprived Petitioner of due process by offering the exhibits into evidence. Therefore, Petitioner has failed to demonstrate that the prosecutor's introduction of the evidence deprived him of a fundamentally fair trial. Donnelly, 416 U.S. at 642-48. Habeas relief on this sub-claim is denied.

### d.   Improper closing argument

Petitioner's final sub-claims of prosecutorial misconduct arise from the prosecutor's closing argument. First, Petitioner claims that the prosecutor "repeatedly attacked" Petitioner's trial counsel during the State's final closing argument. (Dkt. # 1 at 22). Petitioner claims that the prosecutor improperly "shift[ed] the burden of proof to the defense by telling the jury that . . . 'the evidence [has to] come from the stand.'" Id. Additionally, Petitioner claims that the prosecutor attacked the truthfulness of Petitioner when he said, "[t]hat story that the defendant told you is crap." Id. Second, Petitioner argues that the prosecutor made "improper attempts to invoke Societal alarm and to create sympathy for complaining witness." Id. at 23. Finally, Petitioner claims the prosecutor gave an "[i]mproper argument to the jury that they are to 'do justice' and to sentence [Petitioner] to life imprisonment." Id.

Petitioner's jury was instructed that closing arguments are for persuasive purposes. (Dkt. # 14-5, Tr. Vol. II at 227).  Furthermore, during closing arguments, counsel is allowed some latitude. See Hooper, 314 F.3d at 1172 ("The prosecutor also possesses reasonable latitude in drawing inferences from the record."); see also Banks v. Workman, 692 F.3d 1133, 1149 (10th Cir. 2012). "[S]ummations in litigation often have a rough and tumble quality."  United States v. Bennett, 75 F.3d 40, 46 (1st Cir. 1996).  It is important to note that "it is not enough that the prosecutors' remarks were undesirable or even universally condemned."  Banks, 692 F.3d at 1149 (quoting Darden, 477 U.S. at 181).  To be entitled to habeas relief, the remarks must infect the trial with unfairness.  Id.

### i.        Attacks on defense counsel

Petitioner claims the prosecutor, in his second closing argument, "repeatedly attacked Mr. Kyle Killam, defense counsel," and "basically accused defense counsel of lying and/or hiding the true facts." (Dkt. # 1 at 22).  Respondent argues that the prosecutor's statements were not improper because he was summarizing the evidence, challenging defense counsel's inferences about the evidence, and offering his own reasonable inferences for the jury.  (Dkt. # 12 at 29-30).

"Attacks on defense counsel can at times constitute prosecutorial misconduct."  Wilson v. Sirmons, 536 F.3d at 1119 (citing United States v. Young, 470 U.S. at 9 (counsel "must not be permitted to make unfounded and inflammatory attacks on the opposing advocate.")).  "The prosecutor is expected to refrain from impugning, directly or through implication, the integrity or institutional role of defense counsel." Bennett, 75 F.3d at 46 (citing United States v. Boldt, 929 F.2d 35, 40 (1st Cir. 1991)).  However, "it is permissible for the prosecution to comment on the veracity of a defendant's story . . . on account of irreconcilable discrepancies between the defendant's

21

testimony and other evidence in the case." United States v. Kaufman, 485 F. App'x 313, 318 (10th

Cir. 2012) (unpublished)[7] (citing Bland, 459 F.3d at 1025).

During closing argument, defense counsel emphasized a theme that he had introduced during

voir dire and developed during cross-examination of several State's witnesses. "[S]ave the fact that

[Wilson] made up that accusation [of abduction and rape], this would have been an assault and

battery. A domestic disturbance." (Dkt. # 14-7, Tr. Vol. IV at 760-61). Defense counsel proceeded

to highlight discrepancies between the witnesses' testimonies, and stated at least twice, "you tell a

lie often enough, long enough, loud enough, and people will believe you." Id. at 763, 765. Next,

defense counsel went through Wilson's testimony and asked the jury to ask themselves if the actions

taken by Wilson are those that "a reasonable person would do." Id. at 771.

Defense counsel then "proffer[ed] . . . what the defense believes happened that evening," id.

at 773, as follows:

> [Petitioner] gets out of jail. . . . Five days later, he's at Charlene Pipkins'
> house . . . looking for a girl to hook up with . . . [and] to score some rock.  Some
> crack cocaine. [Wilson] shows up at Charlene Pipkins' house . . . [a]nd he produces
> the affidavit and says [she's a snitch]. . . . D.C. becomes aggressive . . . . [Petitioner
> intervenes and says,] I'll handle it.  We'll talk about this. . . . Let's go back to . . . my
> house.
>
> And she willingly goes with him.  Why?  Because they're kicking it. . . . So
> they get a ride. . . . He walks her up to the house and they do everything that they
> normally do. . . . [S]he starts performing oral sex on him. . . . [a]nd usually, the
> standard course was, is that that was it.  You're done.  I've done my job in providing
> you with crack, you've done your job.
>
> But she approaches him on the issue of being a snitch.  Why? Because of that
> expression, 'Snitches wind up in ditches.' . . . If she makes good with [Petitioner],
> she makes good with the group.  So, she approaches [Petitioner] and says, Tony, let's
> talk about this. . . . Tony says, I don't want to talk about it.

---

[7]This and other unpublished court decisions are cited herein as persuasive authority, pursuant
to Tenth Circuit Rule 32.1.

. . . [Wilson calls t]he very person that she said forced her out of her house and that she couldn't ask for help earlier. . . . [Wilson tells Charlene] I'm fixing to go . . . [a]nd sees that the conversation [on the phone] is not going the way that she wants it to, she starts getting edgy.  She starts pulling away from [Petitioner]. . . . And he's getting nervous, because now all of a sudden it sounds like she's accusing him of doing something.

. . . He grabs the phone and she starts screaming. . . . He hits her with a closed fist.  Maybe twice.  Maybe three times.  Not exactly sure. . . . [A]t that very moment, their relationship has just changed.  They are no longer kicking it . . . because in her mind, she is now the snitch.  And he just became an enforcer. . . . She became the snitch that owed him.

. . . She was scared.  And what's the one thing that . . . she can offer? . . . Sex.  So she comes up.  She doesn't want him to be angry anymore. . . . She offers sex.  Come on, Tony, it's okay.  I'm sorry.  And they do.  They have sex.  Smoke some crack.  And they have sex.  They watch a porno tape.  Smoke some more crack, have some more sex.  And eventually [they fall asleep].  But Ms. Wilson wakes up before [Petitioner].  She gets up.  She goes to the bathroom.  But in her mind, now she's thinking, I owe him.  I have to clean his house.  I have to do X, Y, Z.  We don't know.  Because he never concluded that; what she owed him.

And you'll find some letters in the exhibits.  Read those letters.  That is [Petitioner] writing to her about his commitment and his desire to be with Dorothea Wilson.  He cared about her.

That morning . . . [s]he didn't want to stay there.  She didn't want to owe him. [S]he used the bathroom . . . got dressed, . . . and saw that he was stirring.  She opens the door and says, I'm fixing to go.

. . . She's done.  She doesn't want to be the snitch. . . . She doesn't want to go any further with the possibility of being found out as a snitch.  So she runs to the neighbors.

But here's the real kicker.  When she gets there, she's not dumb.  She knows the legal system.  She's in it. . . . Assault and battery ain't going to do it.  She needs a major offense. . . . [S]omething major . . . so that [Petitioner] can't ever get to her again . . . . She has to put [Petitioner] away.  And she knows the system.  She knows she's injured.  She goes, That man, he raped me.  He sodomized me.

Id. at 773-79.

The prosecutor began his second closing argument, stating, "now you have a third version.

Mr. Killam has come up with his own version of what happened that night. . . . It's not what the

defendant told Detective Russo, it's not what the defendant told you."  Id. at 781.  The prosecutor

reminded the jury that "I'm sure the court has instructed you that defense attorney arguments,

including what I'm doing right now to you, is not evidence." Id.  The prosecutor then tells the jury

that defense counsel's version amounts to something he calls "hide the ball."  Id. at 782.  He tells

the jury,

> [E]ven if Mr. Killam wants to get up here and tell you his version for 25 minuets,
> we've got to stay in reality.  We do.  Nobody is trying to pull a fast one here.  But if
> the defense talks to you about a house – the house of cards, or the foundation, and
> you can't believe the house of cards because the foundation is not sturdy . . . .
>           Well, Mr. Killam made the mistake, and the defense has made the mistake,
> of foundation, because the foundation that they're relying on is the defendant.

Id. at 788.

The record does not support Petitioner's claim of improper attacks on defense counsel.

Though defense counsel's closing argument was not a completely "new version" of events, as stated

by the prosecutor,[8] when placed in context of the entirety of the closing arguments, the prosecutor's

comments did not tend to suggest that defense counsel was untruthful.  Rather, the prosecutor

implored the jury to compare defense counsel's version of events with the evidence in the case and

used defense counsel's wall analogy in the State's favor.  Further, the trial judge instructed the jury

that the statements by counsel during closing arguments "are not evidence but are permitted for

purposes of persuasion only," see Dkt. # 14-5, Tr. Vol. II at 227, and that "[t]he State has the burden

of presenting the evidence that establishes guilt beyond a reasonable doubt. . . . Evidence is the

testimony received from the witnesses under oath, stipulations made by attorneys, and the exhibits

admitted into evidence during the trial," see Dkt. # 14-14, O.R. at 70-71.  Petitioner fails to show

that "the prosecutor's statements plausibly could have tipped the scales in favor of the prosecutor."

Fero, 39 F.3d at 1474.  Thus, Petitioner fails to show that the decision by the OCCA was contrary

---

[8] The version of events set forth by defense counsel in closing argument finds some support
in Petitioner's testimony.

to or an unreasonable application of federal law as interpreted by the Supreme Court. Habeas relief is denied.

### ii.      Shifting the burden

Petitioner claims that the prosecutor shifted the burden of proof to the defense during the second closing argument when the prosecutor told the jury that defense counsel was playing "hide the ball" with the affidavit for a search warrant. (Dkt. # 1 at 22; see also Dkt. # 14-7, Tr. Vol. IV at 782-83). Specifically, Petitioner complains that the following statement improperly shifted the burden of proof from the prosecution to the defense:

> But you've got to convince – if you're the defense, you've got to convince y'all, who is sitting here, and then watch that evidence come from the stand, none of that matters.

Id. at 783.

After considering the challenged comment in context, the Court finds that this statement did not shift the burden of proof to the defense. The prosecutor's comment was responsive to defense counsel's closing argument and served to remind jurors that in order to accept defense counsel's version of events, they would have to ignore the evidence presented by the State. In other words, the prosecutor merely argued that the evidence did not support Petitioner's defense theory. See United States v. Simpson, 7 F.3d 186, 190 (10th Cir. 1993) (collecting cases permitting prosecutorial comment on lack of evidence supporting defendants' theories). This sub-claim has no merit.

### iii.      Truthfulness of Petitioner

Petitioner claims that the prosecutor improperly attacked the truthfulness of Petitioner when he said, "[t]hat's why he got up there on the stand. Threw the Hail Mary pass. That story that the defendant told you is crap. . . . The defendant's accounts of events is 'pure dee ridiculous.'" (Dkt.

# 1 at 22).  Respondent argues that these statements were "reasonable inferences . . . based upon Petitioner's testimony."  (Dkt. # 12 at 30).

The Tenth Circuit has stated that "[a]lthough labeling a defendant a 'liar' is often 'unnecessary' and 'unwarranted,' we have held that referring to testimony as a lie is not per se prosecutorial misconduct."  Bland, 459 F.3d at 1025 (citing United States v. Nichols, 21 F.3d 1016, 1019 (10th Cir. 1994); United States v. Robinson, 978 F.2d 1554, 1567 (10th Cir. 1992)) (internal quotations omitted).  Statements "perceived only as commentary on the implausibility of the defendant's story" are permissible.  United States v. Hernandez-Muniz, 170 F.3d 1007, 1012 (10th Cir. 1999) (quotation omitted).  Here, the prosecutor's statements were merely commentary on the veracity of defendant's story.  The first complained of statement, that defendant's story was "crap," came after the prosecutor said, "[a]s the defendant would tell you, it's consensual oral sex," and then proceeded to list the numerous physical injuries Wilson sustained. (Dkt. # 14-7, Tr. Vol. IV at 750). He concluded the list of injuries by stating, "[t]his tells you . . . that the story the defendant told you was crap."  Id.  The second complained-of statement, that defendant's story was "pure dee ridiculous," also followed statements by the prosecutor referencing defendant's testimony that Wilson wanted to have sex five or six times after he "smacked her around a little bit."  Id. at 755. The prosecutor's statements fit within the bounds of commentary on the veracity of defendant's story.  Petitioner fails to show that the prosecutor's statements were improper or that the OCCA's decision was contrary to or an unreasonable application of federal law as interpreted by the Supreme Court.  Habeas relief is denied on this sub-claim.

####    iv.    Societal alarm and sympathy for victim

Petitioner next complains that the prosecutor "elicited sympathy for the complaining witness by saying Dorothea Wilson endured a night that no one should ever have to endure." (Dkt. # 1 at 23). Petitioner also argues that the prosecutor "wanted the jury to be outraged at [Petitioner]," when the prosecutor asked the jury to "'[i]magine somebody out there in the world that does this.'" Id.; Dkt. # 14-7, Tr. Vol. IV at 749. Respondent argues that "the prosecutor was merely summarizing the evidence presented . . . and urging the jury to treat the crime of rape as a crime of violence." (Dkt. # 12 at 31). Additionally, Respondent argues that the prosecutor was not raising societal alarm; instead, "he was recounting Ms. Wilson's testimony about what Petitioner did to her when he raped her." Id. at 32.

As stated above, habeas corpus relief is available for prosecutorial misconduct only when the prosecutor's statements render Petitioner's trial fundamentally unfair. Donnelly, 416 U.S. at 642-48. It is not enough that the statements are undesirable or universally condemned. Darden, 477 U.S. at 181. "While 'improper appeals to societal alarm' and requests for 'vengeance for the community to set an example' are unwarranted, they are also not the type of comments that the Supreme Court has suggested might amount to a due process violation." Brecheen, 41 F.3d at 1356 (quoting Darden, 477 U.S. at 181-82). Even so, "[i]t is improper for a prosecutor to 'encourag[e] the jury to allow sympathy to influence its decision." Stouffer v. Trammell, 738 F.3d 1205, 1221 (10th Cir. 2013) (quoting Moore v. Gibson, 195 F.3d 1152, 1172 (10th Cir. 1999)). However, the prosecutor can draw reasonable inferences from the record. Hooper, 314 F.3d at 1172.

Petitioner references three statements made by the prosecutor, one during first closing argument, and two during second closing argument. During the first closing argument, the

prosecutor described the violence that led up to the forcible oral sodomy.  He stated, "she resisted, but she was scared for her life.  Imagine somebody out there in the world that does this.  And the defendant testified that that's all he really wanted out of the deal."  (Dkt. # 14-7, Tr. Vol. IV at 749).  During second closing argument, the prosecutor told the jury, "[s]o what they [the defense] want you to see, . . . is that you can't believe Dorothea Wilson because they say she's a crackhead.  Well, . . . in this room, credibility is judged there,[9] not by where they hold court and snitches live in ditches.  Credibility is here."  Id. at 789.  The final statement Petitioner complains of occurred while the prosecutor discussed Petitioner's prior felonies and the verdict forms.  The prosecutor told the jury that putting the defendant on the stand  was a "Hail Mary pass."  Id. at 793-94.  The prosecutor said,

> the Hail Mary pass . . . was all aimed to try and get you to just put him in jail for 90 days.  That those five felony convictions don't matter.  He's 39, 40 years old.  Got five prior felony convictions.  That stuff doesn't matter.  Let's put him in the Tulsa County Jail for 90 days, and make it okay to rape someone that we call a crack whore.  You can't rape people.  Even if they're under the influence of crack cocaine.  Even if they're addicted to crack cocaine.  Even if they are a snitch.

Id. at 794.

After a review of the record, the Court concludes that none of the prosecutor's statements fall into the category of "societal alarm" arguments.  The first challenged statement, "[i]magine somebody out there in the world that does this," was made in the context of the specific acts of violence associated with the forcible sodomy, as described by the victim.  It was not a statement designed to "send a message to other similarly situated potential offenders."  See Collins v. Ray, 184 F. App'x 750, 755 (10th Cir. 2006) (unpublished).

---

[9] Based on the context of these statements, it appears the prosecutor was pointing to the witness stand as he made these remarks.  See Dkt. # 14-7, Tr. Vol. IV at 789.

Petitioner also complains that the prosecutor made four statements that "elicited sympathy for the complaining witness." (Dkt. # 1 at 23).  Three came from the first closing argument and one from the second closing argument.  Id.  During the first closing argument, the prosecutor said, "we ask you, . . . when you look at the facts that you received, to consider this case as a violent crime.  Because not only did Dorothea Wilson have to endure a night that no one should ever have to endure, but she was sexually violated, and she endured extreme physical violence." (Dkt. # 14-7, Tr. Vol. IV at 740-41).  A short time later, the prosecutor said, "the defendant doesn't have the scales of justice. . . . The defendant played judge, jury, executioner.  And the defendant believed that nobody – not you – that nobody – law enforcement – nobody would care.  He could do anything he wanted to her because nobody would care."  Id. at 743.  Then, the prosecutor said,

> . . . what happens to snitches? 'Snitches end up in ditches.'  In that world, being a snitch can get you killed.  And as Dorothea Wilson, ladies and gentlemen, let you know, being a snitch can get you raped twice, forcibly sodomized, kidnaped, and assaulted with a dangerous weapon, defendant style.

Id. at 744.  Finally, during second closing argument, the prosecutor told the jury,

> The State presents to you the bloody beaten face of the victim, and her vagina torn up.  That's what the State presents to you.  And the consistent testimony of a victim brave enough to be here to tell you about it.  And to that you get, in response, I'm crippled.  Too crippled to be a rapist.  And it was consensual.  We had sex five or six times that night, after I had already ejaculated from oral sex.
> Does anyone believe. . . that the defendant had sex with Dorothea Wilson five or six times that night?  Really.  I mean – credibility.  What's credible.  What's not credible?  Consider the world.

Id. at 793.  After reviewing the record and placing the prosecutor's comments in context, the Court concludes that the statements by the prosecutor were reasonable inferences based on the evidence and testimony presented at trial.  See Hooper, 314 F.3d at 1172.  Thus, when considered in light of

the trial as a whole, the Court cannot conclude that the statements "tipped the scales in favor of the prosecution." Fero, 39 F.3d at 1474.  Habeas relief is denied on this sub-claim.

### v.        Improper directive to "do justice"

Petitioner's final sub-claim of prosecutorial misconduct during closing argument is that the prosecutor gave an "[i]mproper argument to the jury that they are to 'do justice' and to sentence [Petitioner] to life imprisonment." (Dkt. # 1 at 23).  Petitioner states that "[t]he prosecutor referred to [Petitioner] as [a] 'vicious rapist' where [sic] the case was brought into court." Id.  Petitioner next asserts that the prosecutor told the jury, "'the State urges you . . . And we ask you, . . . to do justice in this case. . . . The State of Oklahoma ask[s] you to do right and send this defendant to prison for the rest of his life.'" Id.  Petitioner argues that these statements "bolster[ed] the credibility of the State." Id.  Respondent argues that the Tenth Circuit has held that "urging a jury to 'do justice' based upon the evidence presented to it is not improper."  (Dkt. # 12 at 32 (citing Thornburg v. Mullin, 422 F.3d 1113, 1134 (10th Cir. 2005))).

"It is improper for a prosecutor to suggest that a jury has a civic duty to convict." Thornburg, 422 F.3d at 1134; see also Malicoat v. Mullin, 426 F.3d 1241, 1256 (10th Cir. 2005).  "Appeals to the jury's emotion or sense of vengeance 'call[ ] into question the integrity of the criminal justice system' by encouraging the jury to convict based on outrage, and not on the evidence." Wilson, 536 F.3d at 1120-21 (citations omitted).  "This restriction 'is balanced, however, by the acknowledgement [sic] that in an emotionally charged trial, the prosecutor's closing argument need not be confined to such detached exposition as would be appropriate in a lecture.'" United States v. Fleming, 667 F.3d 1098, 1104 (10th Cir. 2011) (quoting United States v. Jones, 468 F.3d 704, 708 (10th Cir. 2006) (quotations omitted)).  Further, if the "prosecutor's comments [are] firmly rooted

in the facts of the case," the statements do not render the trial fundamentally unfair. Thornburg, 422

F.3d at 1134.

In this case, Petitioner characterizes several statements by the prosecutor as asking the jury

to "do justice." (Dkt. # 1 at 23). During the first closing argument, the prosecutor said

> If only – if only – the criminal justice world out there, the place where we
> don't see, ladies and gentlemen, under the fluorescent lights or with American flags
> and judges in black robes and defense attorneys. Court; that's a world that helps
> you. Because she came bounding out of that house that morning and the right people
> got involved. And the State arrested a vicious rapist. Took it out of their world
> where they hold court, or where snitches end up in ditches, and brought it to this
> world. Where the rule of law prevails.

(Dkt. # 14-7, Tr. Vol IV at 754). The prosecutor concluded the first closing argument by stating,

> Ladies and gentlemen, the State believes that the defendant should never have
> that problem anymore. The defendant should not have to worry about cleaning his
> house anymore. Worry about bringing other individuals in here to clean his house.
> . . . The State believes that he needs to spend the entirety of his life in prison, ladies
> and gentlemen. Because this is the real court. Not the court he was trying to hold
> out there. This is the real court. And individuals that do this behavior should never
> be out again.

Id. at 756. The Court concludes the two statements were sufficiently based upon the evidence

presented and did not improperly "appeal to the jury's emotion or sense of revenge." Wilson, 536

F.3d at 1120-21.

Petitioner also claims the prosecutor continued to urge the jury to "do justice" in the second

closing argument. In urging the jury to put Petitioner in jail for more than 90 days, the prosecutor

told the jury,

> And it's the type of crime that gets punished, not by 90 days in the Tulsa County Jail,
> but after five felony convictions, you pop them. It's okay to be brave. It's okay to
> do it to these individuals. That's the type of sentence that's deserved. And it's the
> type of sentence that might very well tell those out there holding court – right?
> Snitches in ditches – maybe we can't rape individuals.

31

Id. at 786.  Finally, the prosecutor told the jury,

> . . . the State urges you – or thanks you for your attention in this case.  And we ask you, ladies and gentlemen, to do justice in this case.  Don't slap the wrist.  This is something that happened. . . . It's elements and facts and punishments, and the types of punishments that deter individuals from doing these crimes.  That teaches the folks out there that you can't hold court on someone.  Even if it's their culture, or street ethics.
>
> We do right in this building, ladies and gentlemen.  The State of Oklahoma asks you to do right and send this defendant to prison for the rest of his life.

Id. at 796-97.  Petitioner also points to a similar statement the prosecutor made during opening argument.  (Dkt. # 1 at 21).  In his opening statement, the prosecutor succinctly stated the anticipated evidence and discussed "the code of ethics on the street regarding snitches."  (Dkt. # 14-5, Tr. Vol. II at 237).  He then concluded his remarks by stating,

> [The defendant never thought] in a million years, [this would] be played out to a jury in Tulsa County, Oklahoma, ladies and gentlemen, because nobody is going to pay attention to a snitch.  Or what he says is a crackhead.  But, ladies and gentlemen, that's why we have these rooms.  To do justice.
>
> And at the conclusion of this case, ladies and gentlemen, the State will come back to you and ask you to finally do justice.  Not street justice. No, no.  But the kind of justice that you can only get from a jury of your peers.

Id.

"Appeals to the jury to act as the community conscience are not per se impermissible," yet "prosecutors are not at liberty to urge jurors to convict defendants as blows to the drug problem faced by society or specifically, within their communities, or send messages to all drug dealers." United States v. Solivan, 937 F.2d 1146, 1151, 1153 (6th Cir. 1991); see also United States v. Rogers, 556 F.3d 1130, 1143 (10th Cir. 2009) ("dramatic proclamations can improperly threaten to inflame the passions of the jury"); United States v. Begay, 2013 WL 6671208, at *7 (10th Cir. Dec. 19, 2013) (unpublished).

32

Assuming the statements were improper, the Court concludes Petitioner has failed to establish that they so infected his trial "as to make the resulting conviction a denial of due process." Darden, 477 U.S. at 181.    Additionally, Petitioner has not established that the prosecutor's statements "had a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (citing Kotteakos v. United States, 328 U.S. 750 (1946)).  First, the State presented a strong case against Petitioner.  Each of the individuals who saw Wilson the morning of August 20, 2008, testified consistently as to her physical appearance and her emotional state.  And the story Wilson told each of these individuals was consistent.  Additionally, the State elicited testimony that the first thing Petitioner said to police when he came out of his house was that it was consensual sex, he did not rape her.  (Dkt. # 14-5, Tr. Vol. II at 305).  Second, Wilson's injuries, as observed by Ms. Elias, the SANE nurse, were consistent with Wilson's story. The injuries included swelling on her wrists from being held down, a vaginal tear, and numerous abrasions, swelling, and redness on her face.  (Dkt. # 14-14, O.R. at 23).  Third, the jury was properly instructed that closing arguments are not evidence.  (Dkt. # 14-5, Tr. Vol. II at 227). Fourth, most of the prosecutor's opening and closing arguments focused on the evidence and testimony presented at trial.  Finally, the jury instructions focused on the relevant legal rules and factors for the jury to consider while determining Petitioner's guilt or innocence and his sentence. The instructions, coupled with the testimony at trial, sufficiently show that Petitioner's trial was not fundamentally unfair.  Further, there were no objections to any of these statements.  Upon review of the totality of these factors, this Court is convinced that any impropriety in the prosecutor's statements was harmless because the statements did not have a substantial or injurious effect or influence in determining the jury's verdict.

Finally, Petitioner claims that the prosecutor's statements resulted in an excessive sentence. The Court addresses Petitioner's claim of excessive sentence in Part B(6), below.

Therefore, after carefully reviewing the transcripts and the record, the Court concludes that any prosecutorial misconduct did not render Petitioner's trial fundamentally unfair. The decision by the OCCA was not contrary to, or an unreasonable application of, federal law as determined by the Supreme Court. Accordingly, habeas relief is denied on this sub-claim.

## 2.      Admission of improper and prejudicial evidence (Ground I)

In Ground I, Petitioner claims that "[t]he presentation of improperly admitted, irrelevant and highly prejudicial evidence violated [his] rights to due process, an impartial jury panel, and a fair trial." (Dkt. # 1 at 7). Petitioner states that the "prosecutor repeatedly encouraged various witnesses to vouch for and bolster Ms. Wilson's story about the alleged incident." Id. Petitioner specifically mentions the testimonies of Officer Keith Edding and Kristy Elias, the nurse who conducted Wilson's rape examination. Id. at 7-8. Petitioner next complains that State's Exhibit 2A, a videotaped interrogation of Petitioner, was "inadmissible and highly prejudicial." Id. at 9. Finally, Petitioner complains that the court improperly admitted State's Exhibit No. 51, a "Finding of Fact - Acceptance of Plea" document, that Petitioner had signed in Tulsa County District Court Case No. CF-2003-691. Id. at 10.

On appeal, the OCCA denied relief, finding that Petitioner "was not deprived of a fair trial by the introduction of irrelevant evidence and evidence whose probative value was substantially outweighed by the danger of unfair prejudice." (Dkt. # 12-3 at 2). The OCCA concluded that the trial court did not abuse its discretion in admitting the evidence. Id.

34

Admissibility of evidence is a matter of state law.  The Tenth Circuit has held that a writ of habeas corpus may not issue on the basis of a perceived error of state law "absent a determination that the state law violation rendered the trial fundamentally unfair." James v. Gibson, 211 F.3d 543, 555 (10th Cir. 2000) (citing Boyd v. Ward, 179 F.3d 904, 916 (10th Cir. 1999)).  When a habeas petitioner challenges a state court's admission of evidence, "[t]he question presented in [the habeas proceeding] is not whether th[e] evidence was admissible under state law, but instead whether considered in light of the entire record, its admission resulted in a fundamentally unfair trial." Knighton v. Mullin, 293 F.3d 1165, 1171 (10th Cir. 2002).  Therefore, the Court must determine whether the admission of the alleged bolstering testimony, the video of the police interrogation (Exhibit 2A), and the "Finding of Fact - Acceptance of Plea" document, rendered Petitioner's trial fundamentally unfair.  See Parker v. Scott, 394 F.3d 1302, 1310-14 (10th Cir. 2005) (applying "fundamental fairness" test to a claim of bolstering).

Petitioner first claims that the prosecutor improperly bolstered the credibility of Wilson through the examination of two State's witnesses.  (Dkt. # 1 at 7-8).  As stated above, "[i]t is widely recognized that a party who raises a subject in an opening statement 'opens the door' to admission of evidence on that same subject by the opposing party." Chavez, 229 F.3d at 952; Croft, 124 F.3d at 1120 ("It is permissible . . . to bolster the testimony of a witness whose credibility has been attacked in an opening statement").  Here, defense counsel attacked or questioned the victim's credibility several times during his opening argument.  The Court found above that the prosecutor did not improperly bolster the victim during the direct examination of Officer Eddings and the re-direct examination of Ms. Elias.  Thus, there is no basis for Petitioner's claim that the bolstering testimony was improperly admitted.  Habeas relief is denied on this claim.

Next, Petitioner complains that Exhibit 2A, a video recording of his interview, was improperly admitted into evidence. Petitioner complains that the tape included "highly prejudicial content." (Dkt. # 1 at 9). The video shows an interview of Petitioner by Tulsa Police Detective Rodney Russo. In the interview, Detective Russo and Petitioner make several statements regarding drugs, use of weapons, previous arrests, and the video "show[ed] that the Officer [Russo] and [Petitioner] were overly familiar with each other." Id. Respondent notes that the trial court held a Jackson-Denno hearing[10] regarding the voluntariness of Petitioner's statement. (Dkt. # 12 at 9). The trial court found the statement to be voluntary, denied Petitioner's motion to suppress, and commented that there were "other crimes that may be Burks issues or res gestae." (Dkt. 14-3, Tr. Hr'g Apr. 6, 2009 at 3).

In Oklahoma, Burks v. State, 594 P.2d 771 (Okla. Crim. App. 1979), overruled in part on other grounds by Jones v. State, 772 P.2d 922 (Okla. Crim. App. 1989), sets the standard by which evidence of other crimes is admissible. The OCCA has stated,

> The basic law is well established—when one is put on trial, one is to be convicted—if at all—by evidence which shows one guilty of the offense charged; and proof that one is guilty of other offenses not connected with that for which one is on trial must be excluded. Burks v. State, 1979 OK CR 10, ¶ 2, 594 P.2d 771, 772, overruled in part on other grounds, Jones v. State, 1989 OK CR 7, 772 P.2d 922. . . . . However, evidence of other crimes is admissible where it tends to establish absence of mistake or accident, common scheme or plan, motive, opportunity, intent, preparation, knowledge and identity. Burks, 1979 OK CR 10, ¶ 2, 594 P.2d at 772. To be admissible, evidence of other crimes must be probative of a disputed issue of the crime charged, there must be a visible connection between the crimes, evidence of the other crime(s) must be necessary to support the State's burden of proof, proof of the other crime(s) must be clear and convincing, the probative value of the evidence must outweigh the prejudice to the accused and the trial court must issue

---

[10]Jackson v. Denno, 378 U.S. 368, 376 (1964) ("A defendant objecting to the admission of a confession is entitled to a fair hearing in which both the underlying factual issues and the voluntariness of his confession are actually and reliably determined.").

contemporaneous and final limiting instructions. Welch v. State, 2000 OK CR 8, ¶ 8, 2 P.3d 356, 365.

Lott v. State, 98 P.3d 318, 334-36 (Okla. Crim. App. 2004).  "Burks requires, in part, the State to give a pre-trial notice of the other crimes or bad acts evidence it intends to introduce."  Eizember v. State, 164 P.3d 208, 230 (Okla. Crim. App. 2007).

To the extent that Petitioner complains that he did not receive a Burks notice regarding the video, this is obviously an error of state law.  United States v. Kendall, 766 F.2d 1426, 1441 n.6 (10th Cir. 1985).  Further, the OCCA has emphasized that failure to provide a Burks notice does not automatically require the exclusion of other crimes evidence, as it designed to prevent surprise on the part of the defendant.  Malicoat v. State, 992 P.2d 383, 402-03 (Okla. Crim. App. 2000). Petitioner cannot put forth a good-faith argument that it was a surprise for the video to be offered as evidence at trial in light of the outcome of the Jackson-Denno hearing.[11]  Thus, Petitioner cannot show the failure to provide a Burks notice resulted in a fundamentally unfair trial.

To the extent Petitioner complains that the video should have been redacted prior to its admission, Petitioner fails to show how it rendered his trial fundamentally unfair.  The record shows that Petitioner failed to file any pre-trial motions or make any additional effort to have the video redacted in any way.  Additionally, Petitioner made no objection at the April 6, 2009 Jackson-Denno

---

[11]In addition, the Court takes note that Petitioner may have waived any Burks objection at trial.  During the testimony of Tulsa Police Detective Margaret Loveall, Petitioner's counsel requested a bench conference.  (Dkt. # 14-5, Tr. Vol. II at 378).  Petitioner's counsel told the trial court and the prosecutor that Petitioner wanted to know "why the crack pipes are not going in."  Id. The prosecutor stated, "Because I can't lawfully do it."  Id.  Petitioner's counsel told the court that it would cross-examine on the issue of the crack pipes found at Petitioner's house and photographed by Detective Loveall.  Id. at 378-79.  The trial court stated, "it sounds to me like he [Petitioner] has certainly waived any Burks issue, and the whole issue of cocaine use is just blown away as far as being hidden from the jury."  Id. at 380.  This occurrence undermines Petitioner's claim of denial of due process on the admission of statements of other crimes evidence regarding the use of drugs.

hearing, when the trial court denied the motion to suppress, nor did Petitioner object to publication of the video at trial.  See Dkt. # 14-6, Tr. Vol. III at 450-51.  Finally, several of Petitioner's prior felonies were presented to the jury during the prosecutor's cross-examination of Petitioner and restated by the prosecutor during second closing argument.  See Dkt. # 14-7, Tr. Vol. IV at 683-88; 794-95; Dkt. # 14-14, O.R. at 50, 115.  Petitioner offers only conclusory statements that the video was "highly prejudicial."  Without more, Petitioner's statements are insufficient to warrant relief.

Next, Petitioner complains that Exhibit 51, a document titled "Findings of Fact - Acceptance of Plea," was improperly admitted.  (Dkt. # 1 at 10).  Petitioner argues that "the prosecutor misinformed the trial court and defense counsel by saying, 'And at this point, being this Judgment and Sentence, a self authenticating document, the State would move to admit it as State's Exhibit No. 51.'" Id. (citing Dkt. # 14-7, Tr. Vol. IV at 694).  Petitioner argues that the document is not a Judgment and Sentence and it contains "improper references to the highly prejudicial charges of **kidnaping and rape 1st Degree** under question 10, which were dismissed by the State and amended to an aggravated assault charge." Id.  Petitioner then appears to argue that the evidence of the charges of kidnapping and first degree rape, as found in State's Exhibit No. 51, was improper because the aggravated assault conviction "had already been admitted into evidence previously in the State's Exhibit 46." Id.

Whether it was error by the State to offer this unredacted plea form is immaterial to this Court's discussion.  Petitioner readily admits that the conviction listed on the form in Exhibit 51, was also presented on Exhibit 46.  Exhibit 46 also reflects the kidnapping and first degree rape charges as "original charges" on Exhibit 1 to the Judgment and Sentence.  (Dkt. # 14-10, St. Ex. 46).

As a result, Petitioner fails to show that he was prejudiced by the admission of Exhibit 51, or that his trial was rendered fundamentally unfair by its introduction.

In summary, after a review of the claims of improper admission of evidence set forth by Petitioner in Ground I, the Court concludes that Petitioner has failed to show that the admission of evidence, even if improperly admitted under state law, rendered his trial fundamentally unfair. Therefore, federal habeas relief is denied on Ground I.

### 3.      Denial of motion for a continuance (Ground II)

In Ground II, Petitioner claims that the trial court abused its discretion when it denied his motion for a continuance. (Dkt. # 1 at 12). This "caused [Petitioner] to be denied due process of law and to be prejudiced by unprepared and ineffective assistance of counsel."[12] Id. Petitioner's counsel requested the continuance because "he ha[d] recently ascertained the identity of a witness who was previously unknown and whose testimony is expected to corroborate and or establish the Defendant's innocence" and because "another witness has been located and is residing within the State of Texas [and] is unavailable for the jury trial as it is now set upon the docket." Id. Petitioner claims "[t]he trial court was upset about the lack of previous efforts, if any, to investigate these matters and locate these witnesses." Id. Kenneth Whited was the previously unknown witness and Joyce Brewer was the witness residing in Texas. Petitioner further claims that these two witnesses "could corroborate [his] version of events[, n]amely that Ms. Wilson was compliant and went

---

[12]Petitioner references ineffective assistance of counsel in Ground II. In Ground III, Petitioner explicitly raises a claim of ineffective assistance of counsel for failing to investigate defense witnesses. (Dkt. # 1 at 16). The claim in Ground III rests on the same facts referenced in Ground II. The Court addresses Petitioner's claims of ineffective assistance of counsel in Ground III.

voluntarily with [Petitioner], without any threat or duress or weapon, thereby specifically refuting the charge of kidnaping." Id. at 12-13.

The OCCA found the trial court did not abuse its discretion in denying the motion for a continuance. (Dkt. # 12-3 at 2). Respondent argues that this is a matter of state law because "[t]he decision to grant or deny a continuance is in the discretion of the trial court and in some cases, Oklahoma statutes dictate how such a motion must be presented." (Dkt. # 12 at 13). Further, Respondent argues that the testimony "from these witnesses that they did not see a knife in Petitioner's hands would have been cumulative to other testimony." Id. at 15.

"[B]road discretion must be granted trial courts on matters of continuances." Morris v. Slappy, 461 U.S. 1, 11 (1983). The Tenth Circuit has noted that, "[a] trial judge's decision to deny a motion for continuance constitutes an abuse of discretion only if the denial was 'arbitrary or unreasonable and materially prejudiced the [defendant].'" See Phillips v. Ferguson, 182 F.3d 769, 775 (10th Cir. 1999) (quoting United States v. Rivera, 900 F.2d 1462, 1475 (10th Cir. 1990)). Whether denial of a continuance constitutes an abuse of discretion

> turns largely upon the circumstances of the individual case[,] . . . including: the diligence of the party requesting the continuance, the likelihood that the continuance, if granted, would accomplish the purpose underlying the party's expressed need for the continuance, the inconvenience to the opposing party, its witnesses, . . . and the harm that appellant might suffer as a result of the . . . court's denial of the continuance."

Case v. Mondragon, 887 F.2d 1388, 1396 (10th Cir. 1989) (citations omitted). In a habeas proceeding, the abuse of discretion "'must have been so arbitrary and fundamentally unfair that it violates constitutional principles of due process.'" Id. (quoting Hicks v. Wainwright, 633 F.2d 1146, 1148 (5th Cir. 1981)).

Here, Petitioner alleges that it was "fundamental error for the judge to determine the direction the defense should be conducted" and that he was "severely prejudiced by the trial court's denial of the requested continuance." (Dkt. # 1 at 13). Petitioner's motion for continuance was filed May 11, 2009, the day before Petitioner's trial began.  (Dkt. # 14-14, O.R. at 53).  In the motion, Petitioner's counsel stated that "he has just recently ascertained the identity of a witness who was previously unknown and whose testimony is expected to corroborate and or establish the Defendant's innocence."  Id.  Additionally, counsel stated that "another witness has been located and is residing within the state of Texas, said witness is unavailable for the jury trial as it is now set upon the docket."  Id.

On May 12, 2009, prior to voir dire, the trial court heard arguments on Petitioner's motion. (Dkt. # 14-4, Tr. Vol. I at 2-7).  During the hearing the court asked defense counsel, "this case has been pending about, what, nine months or ten months? Can you tell me about any efforts that either you or your predecessor have made to locate this witness. . . . I guess I'd like to just have a representation as to what you know [about] the efforts that have been made to located this unknown black male."  Id. at 4.  Defense counsel told the court that his efforts were isolated to asking Petitioner's family to contact friends.  Id. at 5.  The court denied the motion, reasoning that these witnesses "are not witnesses to the . . . allegations of the assault itself . . . [and] would circumstantially provide testimony . . . simply by their observation of the demeanor of the defendant and the victim."  Id. at 6-7.   Further, the court told defense counsel that "the defendant himself would have some higher opportunity to inform you and counsel as to who that was, or at least provide a fairly clear identification."  Id. at 5.  Finally, the court stated that "as a matter of weighing

41

the alternatives of continuing the case when the State's ready and otherwise you're ready, Mr. Killam, I think that it would be improper [to grant a continuance]." Id. at 7.

The record shows that the trial court's decision to deny the motion for continuance was not arbitrary and that the court weighed several factors. Therefore, Petitioner has failed to show that he was denied due process, prejudiced by the denial of the motion for a continuance, or that the trial court's decision was fundamentally unfair. It should also be noted that Kenneth Whited appeared at trial and testified. This is discussed in further detail in Grounds III and V. Petitioner is not entitled to relief on Ground II.

### 4.    Ineffective assistance of trial counsel (Ground III)

In Ground III, Petitioner cites four instances of ineffective assistance of counsel. (Dkt. #1 at 16). First, Petitioner claims that his defense counsel failed to investigate fully potential witnesses, namely Kenneth Whited, the male driver of the car, and Joyce Brewer, the female passenger.[13] Id. Second, Petitioner alleges that his counsel failed to object to "cumulative, prejudicial evidence," namely State's Exhibit 51. Id. at 17. Next, Petitioner alleges that counsel "failed to object to prejudicial and inadmissible statements and other crimes evidence in the videotaped interrogation of his client." Id. Finally, Petitioner claims that his counsel was ineffective for failing "to object to prejudicial and improper voir dire questions by the State that tainted the jury panel and prejudiced them against his client." Id. at 18.

---

[13]In Ground II, Petitioner raised a claim that he was denied effective assistance of counsel when the trial court denied his motion for a continuance. (Dkt. # 1 at 12). The claim here in Ground III encompasses the facts of the Ground II claim. The Court is incorporating the claim from Ground II into the discussion of the claim here in Ground III.

The OCCA reviewed these claims under the two-pronged standard set forth by the Supreme Court in Strickland v. Washington, 466 U.S. 668, 687 (1984). The OCCA found that Petitioner was not denied effective assistance of counsel. (Dkt. # 12-3 at 3). Respondent argues that the "OCCA's decision that trial counsel was not ineffective is neither contrary to nor an unreasonable application of federal law." (Dkt. # 12 at 19).

To be entitled to habeas relief on his claim of ineffective assistance of trial counsel, Petitioner must demonstrate that the OCCA's adjudication of this claim is contrary to Strickland. "For purposes of § 2254(d)(1), 'an unreasonable application of federal law is different from an incorrect application of federal law.'" Richter, 131 S. Ct. at 785 (quoting Williams v. Taylor, 529 U.S. 364, 410 (2000) (O'Connor, J. concurring)). "Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." Id. at 786. Section 2254(d) "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther." Id.

Under Strickland, a defendant must show that his counsel's performance was deficient and that the deficient performance was prejudicial. Strickland, 466 U.S. at 687; Osborn v. Shillinger, 997 F.2d 1324, 1328 (10th Cir. 1993). A defendant can establish the first prong by showing that counsel performed below the level expected from a reasonably competent attorney in criminal cases. Strickland, 466 U.S. at 687–88. In making this determination, a court must "judge . . . [a] counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."

Id. at 690.  There is a "strong presumption that counsel's conduct falls within the range of reasonable professional assistance."  Id. at 688.  Moreover, review of counsel's performance must be highly deferential.  "[I]t is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable."  Id. at 689. To establish the second prong, a defendant must show that this deficient performance prejudiced the defense, to the extent that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id. at 694; see also Sallahdin v. Gibson, 275 F.3d 1211, 1235 (10th Cir. 2002); Boyd v. Ward, 179 F.3d 904, 914 (10th Cir. 1999). This Court's review of the OCCA's decision on ineffective assistance of counsel claims is "doubly deferential."  Cullen v. Pinholster, 131 S. Ct. 1388, 1403 (2011) (noting that a habeas court must take a "highly deferential" look at counsel's performance under Strickland and through the "deferential" lens of § 2254(d)).

Petitioner first claims that "defense counsel did not adequately investigate to determine the[] whereabouts or identities" of the two people in the vehicle with Petitioner and Wilson on the night of August 19, 2009.  (Dkt. # 1 at 16).  Petitioner states that he "was seriously prejudiced by the failure of defense counsel to promptly investigate this case."  Id.  Petitioner claims the two individuals in the vehicle were Kenneth Whited, the driver, and Joyce Brewer, a passenger.  Id. Petitioner claims that their testimony "could corroborate [Petitioner's] testimony that Wilson went willingly, without duress, and without any weapons of any kind being used."  Id.

Here, even if counsel performed deficiently in failing to investigate fully these witnesses, Petitioner fails to show how the witnesses' testimony would have changed the outcome of the trial.

44

Kenneth Whited did testify at Petitioner's trial.  He testified that he gave a ride to Petitioner and a woman, but it occurred in the "wintertime."  (Dkt. # 14-6, Tr. Vol. III at 593).  The trial court excused Whited and stated, "I understand he's been brought in to provide corroborative information[, b]ut his firm testimony that this is a wintertime encounter in November puts this situation clearly and absolutely outside the possibility of it happening in August." Id. at 598. Joyce Brewer did not appear at Petitioner's trial to testify.  Petitioner claims Brewer's testimony would corroborate his version of events, that Wilson willingly got in the truck with Petitioner.  (Dkt. # 1 at 16).  Petitioner argues, "[h]ad the jury heard the testimony . . . they might have determined that no kidnaping occurred and that none of the other allegations against [Petitioner] warranted a finding of guilt. Id.  Yet, the charge of kidnapping was expressed as "secretly confin[ing] and imprison[ing Wilson] against her will" at Petitioner's address of 1712 N. Elgin Avenue in Tulsa, Oklahoma. (Dkt. # 14-14, O.R. at 14).  It was not based on the ride to Petitioner's house.  Therefore, there is no reasonably probability that Brewer's testimony would  have affected the outcome of the trial. Petitioner has failed to show his counsel was ineffective for failing to investigate Whited and Brewer.

Next, Petitioner claims that his counsel failed to "object[] to the State's cumulative and prejudicial introduction of State's Exhibit 51."  (Dkt. # 1 at 17).  Petitioner argues that the information in Exhibit 51 "had previously been properly admitted [in Exhibit 46] to prove that [Petitioner] had a former conviction for aggravated assault and battery." Id.  However, Petitioner complains that Exhibit 51 included a statement, in Petitioner's own handwriting, that he "was of

'robust' health"[14] and the original charges filed, "kidnaping and rape, 1st degree . . . were merely allegations and not convictions." Id. Petitioner claims that counsel's failure to object allowed "overwhelmingly prejudicial" information before the jury. Id. As discussed in Part B(2) above, the information concerning prior charges and conviction included in Exhibit 51 was introduced and admitted in Exhibit 46. See Dkt. # 14-10, St. Ex. 46; Dkt. # 14-11, St. Ex. 51. As a result, it is reasonably unlikely that Petitioner's counsel would have prevailed had he raised an objection to Exhibit 51. Petitioner fails to show that his trial counsel's performance was deficient. Furthermore, in light of the evidence presented at trial, Petitioner has not demonstrated that he was prejudiced by the admission of Exhibit 51.

Third, Petitioner claims that his trial counsel "failed to object to prejudicial and inadmissible statements and other crimes evidence" in State's Exhibit 2A, the videotaped interview of Petitioner. (Dkt. # 1 at 17). Petitioner claims that the jury "judged [him] much harsher than if these prejudicial statements had been properly redacted from the interrogation video that was admitted at trial in its complete form." Id. Petitioner argues that, despite a warning from the trial court about Burks issues, his counsel failed to request redaction of "the inadmissible, irrelevant and highly prejudicial parts of that videotape." Id.

---

[14] The statement in Exhibit 51 reads, as follows, "On [illegible]-03 in Tulsa Co., OK, I, a person of robust health, committed an assault and battery upon an incapacitated (high & drunk) woman by hitting her and pulling a portion of her hair out." (Dkt. # 14-11, St. Ex. 51). Petitioner wrote this statement on August 29, 2003. Id. The State introduced the plea form to counter Petitioner's claim that he was crippled and "incapable of chasing" Wilson. (Dkt. # 14-7, Tr. Vol. IV at 696). Petitioner testified that he was "crippled because [he] got shot a long time ago in [his] leg and it caused a lot of nerve damage." Id. at 662. Petitioner testified that Wilson knew of this injury and defense counsel had Petitioner show the jury a "two and a half inch to four inch wide scar approximately three inches from [Petitioner's right] knee." Id. at 662-63. Petitioner claimed that Wilson's statements that she could not get away from Petitioner were "very incorrect." Id. at 664.

As stated above, "when one is put on trial, one is to be convicted – if at all – by evidence which shows one guilty of the offense charged; and proof that one is guilty of other offenses not connected with that for which one is on trial must be excluded." Lott v. State, 98 P.3d at 334 (citing Burks v. State, 594 P.2d at 772).   "However, evidence of other crimes is admissible where it tends to establish absence of mistake or accident, common scheme or plan, motive, opportunity, intent, preparation, knowledge and identity." Id.  Moreover, the OCCA has held that its decision in Burks did not relieve defense attorneys of the need "to object to inadmissible evidence of other crimes." Oxley v. State, 941 P.2d 520, 524 (Okla. Crim. App. 1997).  The OCCA went on to state, "[f]ailure to object to the admission of other-crimes evidence . . . may  not be considered on appeal." Id.

After a review of the record, even if Petitioner's trial counsel should have objected to the admission of the video in its entirety, Petitioner has failed to show how he was prejudiced by the statements in the video.  First, Petitioner testified at trial that he had just gotten out of jail a few days before August 19, 2008, the night he went to Charlene Pipkins' house.  (Dkt. # 14-7, Tr. Vol. IV at 649).  Second, Petitioner also testified that he voluntarily exchanged drugs for sex with Wilson and other girls.  Id. at 652.  Finally, during cross-examination of Petitioner, the State introduced five prior felony convictions dating back to 1987.  Id. at 683-688.  In light of this testimony, Petitioner fails to show how the statements on the video were prejudicial.  Further, Petitioner fails to show how the outcome would have been different had trial counsel objected.

Finally, Petitioner claims that his counsel failed to object to improper voir dire questions by the State, which resulted in a "tainted . . . jury panel and prejudiced them against his client." (Dkt. # 1 at 18).  Specifically, Petitioner complains that the "line of questions was highly improper and created both an emotional response in jurors and sympathy for the alleged victim." Id.  The Court

has discussed the prosecutor's voir dire statements in greater detail in Part B(1), above.  For the purposes of Petitioner's claim of ineffective assistance of counsel, however, Petitioner must demonstrate that but for counsel's deficient performance (here, failure to object), there exists a reasonable probability that the result of the proceedings would have been different.  Petitioner fails to meet this burden.

In summary, Petitioner has failed to show that his counsel's performance was deficient or that, but for deficient performance by trial counsel, there exists a reasonable probability of a different outcome.  Additionally, Petitioner fails to show that the OCCA's decision that Petitioner was not denied "his Sixth Amendment right to effective assistance of counsel" was contrary to, or an unreasonable application of, Strickland.  It is not possible that fairminded jurists could disagree that the OCCA's ruling was inconsistent with the holdings of the Supreme Court.  Richter, 131 S. Ct. at 786.  Therefore, because Petitioner failed to meet his burden under § 2254(d), the Court concludes that habeas relief is denied as to Ground III.

### 5. Exclusion of testimony of Kenneth Whited (Ground V)

In Ground V, Petitioner claims that the trial court improperly took on the role of advocate and not that of an impartial tribunal when it excluded Kenneth Whited's testimony. (Dkt. # 1 at 26). Petitioner claims that the court "prevented [him] from presenting this witness in [sic] his own behalf." Id. Petitioner also argues that "the trial judge's desire to have evidence properly presented was not consistently enforced throughout this trial," as shown by his admission of State's Exhibits 2A and 51.  Id. at 27.  On direct appeal, the OCCA found that "the trial court's actions in questioning the witness and then dismissing him were proper." (Dkt. # 12-3 at 3).  It also found that

the actions by the trial court "did not indicate bias but rather fell within its broad discretion regarding the admission of evidence to ensure both sides of a fair trial." Id.

In conducting habeas review, "a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. at 67-68. A petitioner's right to a fair trial, as well as his Fourteenth Amendment right to due process, includes the right to present witnesses in his own defense. Richmond v. Embry, 122 F.3d 866, 871 (10th Cir. 1997) (citing Washington v. Texas, 388 U.S. 14, 18-19 (1967)). However, "[i]n presenting such testimony, the defendant must comply with established rules of evidence and procedure as required by the state 'to assure both fairness and reliability in the ascertainment of guilt and innocence.'" Id. at 871-72 (quoting Chambers v. Mississippi, 410 U.S. 284, 302 (1973)). The materiality of the excluded testimony determines whether Petitioner has been deprived of a fundamentally fair trial. Maes v. Thomas, 46 F. 3d 979, 987 (10th Cir. 1995). "Evidence is material if its suppression might have affected the trial's outcome." Young v. Workman, 383 F.3d 1233, 1238 (10th Cir. 2004) (citing United States v. Valenzuela-Bernal, 458 U.S. 858, 868 (1982)).

Here, the defense presented Mr. Whited as the individual who drove Petitioner and Wilson to Petitioner's house the night of August 19, 2008. As direct examination began, Whited testified that he gave Petitioner a ride in his vehicle "at least three months ago . . . [in] wintertime. So . . . November, somewhere in there I guess." (Dkt. # 14-6, Tr. Vol. III at 593). After several more questions, the trial court asked counsel to approach the bench. Id. at 596. The trial judge told counsel he was confused because the witness said "that this encounter occurred about three months ago, and that it was in winter." Id. The court asked Mr. Whited a series of questions to clarify the date he gave Petitioner a ride. Mr. Whited eventually answered, "what I'm saying is, it was like

49

November of last year, of '08. . . . It was still cold outside." Id. at 598.  The State asked the court to exclude the witness.  Id.  The court agreed, stating "his firm testimony that this is a wintertime encounter in November puts this situation clearly and absolutely outside the possibility of it happening in August, which, as we know, is the time of the incident in question."  Id.  Petitioner fails to explain how the exclusion of the testimony deprived him of a fundamentally fair trial.

As to Petitioner's implied complaint of bias, the Court finds no merit in the claim.  "It is true that a trial judge should never evince the attitude of an advocate."  Brinlee v. Crisp, 608 F.2d 839, 852 (10th Cir. 1979) (citing Gardner v. United States, 283 F.2d 580, 581 (10th Cir. 1960)).  "However to sustain an allegation of bias by the trial judge as a ground for habeas relief a petitioner must factually demonstrate that during the trial the judge assumed an attitude which went further than an expression of his personal opinion and impressed the jury as more than an impartial observer."  Id. at 852–53 (citing Glucksman v. Birns, 398 F. Supp. 1343, 1350 (S.D.N.Y. 1975)).  Petitioner cannot show, nor does the record reflect, that the trial court assumed such an attitude or impressed the jury as more than an impartial observer.  The rules of evidence guide a court's decision on admissibility of evidence at trial.  The trial court took steps to assure both fairness and reliability in the ascertainment of guilt or innocence.  Therefore, after reviewing the record, the Court denies habeas relief on Ground V.

### 6.      Excessive sentence (Ground VI)

In Ground VI, Petitioner claims that the "improperly admitted, highly prejudicial evidence and prosecutorial misconduct resulted in an excessive sentence" for Petitioner.  (Dkt. # 1 at 30). Petitioner claims that the combination of the admission of State's Exhibits 2A and 51 and the "numerous instances of prosecutorial misconduct," resulted in an excessive sentence.  Id.  The

OCCA found that Petitioner did not receive an excessive sentence, as it was within the statutory range and did "not shock the conscience of the Court." (Dkt. # 12-3 at 3-4).

A habeas court affords "wide discretion to the state trial court's sentencing decision, and challenges to the decision are not generally constitutionally cognizable, unless it is shown that the sentence imposed is outside the statutory limits or unauthorized by law." Dennis v. Poppel, 222 F.3d at 1258. Federal habeas review generally ends "once we determine the sentence is within the limitation set by statute." Id. As discussed above, Petitioner had five previous felonies and he faced a sentencing range up to life for each count of rape, kidnapping, and forcible sodomy. (Dkt. # 14-14, O.R. at 98, 102, 105). Thus, the sentence of life imprisonment for each count of rape, twenty years for kidnapping, and twenty-five years for forcible sodomy is within the limits of Oklahoma law. There is no basis for habeas relief.

### 7.    Cumulative error (Ground VII)

In Ground VII, Petitioner claims "[t]he cumulative effect of all these errors deprived [him] of a fair trial and warrant relief." (Dkt. # 1 at 33). The OCCA concluded that, "although his trial was not error free, any errors and irregularities, even when considered in the aggregate, do not require relief because they did not render his trial fundamentally unfair, taint the jury's verdict, or render sentencing unreliable. Any errors were harmless beyond a reasonable doubt, individually and cumulatively."[15] (Dkt. # 12-3 at 4). Respondent argues that this decision "was not contrary to or an unreasonable application of federal law." (Dkt. # 12 at 35).

In analyzing a cumulative error claim, the proper inquiry "aggregates all the errors that individually might be harmless [and therefore insufficient to require reversal], and it analyzes

---

[15]The OCCA does not articulate the specific errors it identified.

whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." <u>United States v. Wood</u>, 207 F.3d 1222, 1237 (10th Cir. 2000) (quotation omitted).  "In the federal habeas context, the only otherwise harmless errors that can be aggregated are federal constitutional errors, and such errors will suffice to permit relief under cumulative error doctrine only when the constitutional errors committed in the state court trial so fatally infected the trial that they violated the trial's fundamental fairness." <u>Matthews v. Workman</u>, 577 F.3d 1175, 1195 n.10 (10th Cir. 2009) (internal quotation omitted); <u>Grant v. Trammell</u>, 727 F.3d 1006, 1025 (10th Cir. 2013) (quoting <u>Rivera</u>, 900 F.2d at 1470).  Cumulative impact of non-errors is not part of the analysis.  <u>Le v. Mullin</u>, 311 F.3d 1002, 1023 (10th Cir. 2002) (citing <u>Rivera</u>, 900 F.2d at 1471).  "[A]ll a defendant needs to show is a strong likelihood that the several errors in his case, when considered additively, prejudiced him." <u>Id.</u> at 1026.

In this case, the Court did not find two or more constitutional errors. As a result, there is no basis for a cumulative error analysis. Therefore, Petitioner has failed to demonstrate that the OCCA's rejection of this claim was contrary to, or an unreasonable application of, federal law as determined by the Supreme Court. 28 U.S.C. § 2254(d).  Habeas relief is denied.

## C.     Certificate of appealability

Rule 11, <u>Rules Governing Section 2254 Cases in the United States District Courts</u>, instructs that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  Pursuant to 28 U.S.C. § 2253, the court may issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," and the court "indicates which specific issue or issues satisfy [that] showing."  A petitioner can satisfy that standard by demonstrating that the issues raised are debatable among jurists, that a

court could resolve the issues differently, or that the questions deserve further proceedings.  Slack v. McDaniel, 529 U.S. 473, 483-84 (2000) (citing Barefoot v. Estelle, 463 U.S. 880, 893 (1983)).

After considering the record in this case, the Court concludes that a certificate of appealability should not issue.  Nothing suggests that the Tenth Circuit would find that this Court's application of AEDPA standards to the decision by the OCCA was debatable amongst jurists of reason.  See Dockins v. Hines, 374 F.3d 935 (10th Cir. 2004).  The record is devoid of any authority suggesting that the Tenth Circuit Court of Appeals would resolve the issues in this case differently.  A certificate of appealability shall be denied.

### *CONCLUSION*

After careful review of the record, the Court concludes that Petitioner has not established that he is in custody in violation of the Constitution or laws of the United States.  Therefore, the petition for writ of habeas corpus shall be denied.

**ACCORDINGLY, IT IS HEREBY ORDERED** that,

1.    The Clerk of Court shall substitute Robert Patton, Director, as party respondent in this case.

2.    The petition for writ of habeas corpus (Dkt. # 1) is **denied**.

3.    A certificate of appealability is **denied**.

4.    A separate judgment shall be entered in this matter.

**DATED** this 25th day of March, 2014.

_____
GREGORY K. FRIZZELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT